United States Court of Appeals
Fifth Circuit

**F I L E D**

May 11, 2006

Charles R. Fulbruge III
Clerk

In the

United States Court of Appeals

for the Fifth Circuit

_____

№ 04-30877
Consolidated with
№ 05-30212

_____

CENTER FOR INDIVIDUAL FREEDOM,

Plaintiff-Appellant,

VERSUS

PAUL J. CARMOUCHE; ROBERT ROLAND; JOHN W. GREENE;
E.L. GUIDRY; R.L. HARGROVE, JR.; MICHAEL J. KANTROW;
HENRY C. PERRETT, JR.; ASCENSION DELGADO SMITH;
DOLORES SPIKES; EDWIN O. WARE; T.O. PERRY; JOSEPH MASELLI,

Defendants-Appellees.

_____

Appeals from the United States District Court
for the Western District of Louisiana

_____

Before DAVIS, SMITH, and DENNIS,
    Circuit Judges.

JERRY E. SMITH, Circuit Judge:

The Center for Individual Freedom (the "Center") challenges, on First Amendment grounds, the dismissal of its complaint questioning the constitutionality of certain provisions of Louisiana's Campaign Finance Disclosure Act ("CFDA"). Reading the statute narrowly to avoid constitutional problems, we affirm.

I.

The Center is a nonpartisan, nonprofit § 501(c)(4) corporation whose stated goal is "to protect and defend individual freedoms and individual rights guaranteed by the U.S. Constitution." Complaint ¶ 3. To further this goal, in advance of the September 18, 2004, primary to fill a vacancy on the Louisiana Supreme Court, the Center desired "to speak to the [Louisiana] public . . . on matters of vital public interest, including . . . criminal law enforcement and sentencing, legal reform, and judicial decision-making." Complaint ¶ 10.

To that end, the Center wanted to finance and run television and radio advertisements that, while not advocating the election or defeat of any candidate, would refer to the positions of the candidates on issues of importance to the Center. Fearing, however, that its advertisements would be deemed as intended to influence an election and that it therefore would be forced to make certain disclosures under the CFDA, the Center opted to refrain from running any ads until the constitutionality of the relevant provisions of the statute could be determined.

On August 24, 2004, the Center sued the District Attorney for the 1st Judicial District of Louisiana and various members of the Supervisory Committee for Campaign Finance of the Louisiana Board of Ethics under the Civil Rights Act, 42 U.S.C. § 1983, and the Declaratory Judgment Act, 28 U.S.C. § 2201. The defendants (collectively, "the Board") are responsible for implementing and enforcing the CFDA. The Center asserts that certain provisions of the CFDA violate the First Amendment and are therefore invalid. The Center alleges that at the time it filed its complaint, "planning and development of the contemplated ads [was] well-advanced." Complaint ¶ 10.[1]

The Center sought temporary, preliminary and permanent injunctive relief from enforcement of the CFDA. After a hearing on the motion for preliminary injunction, the district court held that the Center has standing to mount a facial attack but denied preliminary injunctive relief on the ground that the Center has little likelihood of success on the merits because the relevant provisions of the CFDA were equivalent to the provisions of the federal campaign finance statute that had withstood First Amendment challenge in *Buckley v. Valeo*, 426 U.S. 1 (1976).

The Center then sought emergency injunctive relief from this court pending appeal. After we had denied that request, the parties agreed that the district court could render a final judgment on the merits of the complaint on the basis of the record and the submissions made in conjunction with the preliminary injunction motion. For the reasons articulated in

---

[1] Because the Center did not run the ads and make the choice between complying with the CFDA and waiting for the Act to be enforced against it, the Center is asserting a facial, rather than as-applied, challenge to the constitutionality of the statute.

its ruling on the preliminary injunction motion, the court dismissed the complaint.

## II.

The Board argues that this case is nonjusticiable because the Center lacks standing and because the completion of the relevant election renders the complaint moot. We review all questions of subject matter jurisdiction, including the justiciability issues of standing, ripeness, and mootness, *de novo*.[2]

### A.

To have standing, a plaintiff must demonstrate that he has been injured, that the defendant caused the injury, and that the requested relief will redress the injury. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The Board argues that the Center lacks standing to contest the constitutionality of the CFDA because the Board never took or threatened to take action against the Center under the statute. Pointing to the highly generalized manner in which the complaint describes the proposed ads, the Board asserts that the Center's belief that it would be held to the disclosure requirements of the CFDA is entirely subjective and insufficient to support standing. The Board contends that without any enforcement action taken against it by the Board, the Center cannot challenge the application of the CFDA.

In *Adams v. Askew*, 511 F.2d 700, 704 (5th Cir. 1975), we noted that "[the plaintiffs] . . . confuse an attack on the constitutionality of a statute on its face with an attack on the statute as applied." The contention that a party cannot challenge a statute as-applied unless the

statute has been applied to him is generally correct.[3] Because, however, our task is to decide whether the Center has standing to launch a facial, rather than as-applied, challenge, that tautology is not helpful.

The district court held that the Center has standing to challenge the constitutionality of the relevant provisions of the CFDA on their face. Both its conclusion and its reasoning are sound. It is true that facial challenges are generally disfavored because they "entail a departure from the norms of federal-court adjudication by calling for relaxation of familiar standing requirements to allow a determination that the law would be unconstitutionally applied to different parties and different circumstances from those at hand." *Sabri v. United States*, 541 U.S. 600, 609 (2004). The *Sabri* Court acknowledged, however, that there are concerns in the First Amendment context that are "weighty enough to overcome our well-founded reticence" regarding facial challenges. *Id.* at 610.

As the district court noted, "[t]he First Amendment challenge has unique standing issues because of the chilling effect, self-censorship, and in fact the very special nature of political speech itself." Trial Transcript at 84. This assessment is based largely on *Dombrowski v. Pfister*, 380 U.S. 479, 486-87 (1965), in which the Court observed that

[a] criminal prosecution under a statute regulating expression usually involves imponderables and contingencies that themselves may inhibit the full exercise of First Amendment freedoms . . . . Because of the sensitive nature of constitutionally protect-

---

[2] *See Bissonnet Invs., LLC v. Quinlan*, 320 F.3d 520, 522 (5th Cir. 2003); *Sample v. Morrison,* 406 F.3d 310, 312 (5th Cir. 2005).

[3] Exceptions include circumstances where third-party standing is appropriate.

ed expression, we have not required that all of those subject to overbroad regulations risk prosecution to test their rights . . . . We have fashioned this exception to the usual rules governing standing because of the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute of sweeping and improper application . . . . By permitting determination of the invalidity of these statutes without regard to the permissibility of some regulation on the facts of particular cases, we have, in effect, avoided making vindication of freedom of expression await the outcome of protracted litigation.

The Court echoed this conclusion in *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988), when it stated that "the alleged danger of [the challenged statute] is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution."

Controlling precedent thus establishes that a chilling of speech because of the mere existence of an allegedly vague or overbroad statute can be sufficient injury to support standing. The Center states that it "is not willing to expose itself and its staff to civil and criminal penalties and its contributors to disclosure," and thus it "has been forced to refrain from speaking . . . ." Complaint ¶ 15. To satisfy standing requirements, however, this type of self-censorship must arise from a fear of prosecution that is not "imaginary or wholly speculative." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979).

The Center "intend[ed] to refer to the position of specific candidates on issues of importance to it." Complaint ¶ 13. In a 1999 advisory letter, the Board stated that "[i]f the message is unmistakable, unambiguous, and suggestive of only one plausible meaning, and if that meaning is an expression of preference of one candidate over another candidate, then the underlying contributions and expenditures should be reported as otherwise required by applicable provisions of the CFDA."[4] In addition, in a recent opinion imposing a $20,000 fine on the Republican State Leadership Committee, the Board held that the CFDA is applicable where "any viewer of the advertisement would understand, *even without explicit word[s] of express advocacy*, that when taken as a whole and in its factual context, the unmistakable intent of the advertisement was to oppose or otherwise influence [a particular candidate's] election."[5]

Given the Board's interpretation of the CFDA, if the Center pointed out the positions of candidates on issues of importance to it, it would run a nonspeculative risk that the Board would construe its ads as an "expression of preference of one candidate over another candidate" and therefore would prosecute a wilful failure to make the required disclosures. On that basis, the Center's self-censorship constitutes sufficient injury to confer standing to challenge the constitutionality of the CFDA on its face.

The causation and redressability prongs of the standing inquiry are easily satisfied here. Potential enforcement of the statute caused the Center's self-censorship, and the injury could be redressed by enjoining enforcement of the CFDA. The Center therefore has standing to mount its facial challenge.

---

[4] La. Bd. of Ethics, Campaign Finance Advisory Op. No. 1999-580 (Sept. 17, 1999).

[5] La. Bd. of Ethics, Campaign Finance Ruling No. 2003-746 (Jan. 13, 2005) (emphasis added).

### B.

The Board contends that the Center's claim is moot because the election that gave rise to the complaint has already occurred. Mootness is "the doctrine of standing in a time frame. The requisite personal interest that must exist at the commencement of litigation (standing) must continue throughout its existence (mootness)." *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980). Generally, any set of circumstances that eliminates actual controversy after the commencement of a lawsuit renders that action moot.

There are, however, exceptions to the operation of the mootness doctrine. For purposes of this case, the relevant exception is "the class of controversies capable of repetition, yet evading review." *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 774 (1978). Outside the class action context, the "capable of repetition, yet evading review" exception can be invoked if two elements are met: "(1) [T]he challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975).

Controversy surrounding election laws, including campaign finance regulations, is one of the paradigmatic circumstances in which the Supreme Court has found that full litigation can never be completed before the precise controversy (a particular election) has run its course.[6] Echoing Supreme Court precedent, this court stated in *Morial v. Judiciary Comm'n*, 565 F.2d 295, 297 n.3 (5th Cir. 1977), that "[s]uits challenging the validity of state election laws are classic examples of cases in which the issues are 'capable of repetition, yet evading review.'" The case before us therefore satisfies the first prong of that exception.

With regard to the second prong of the "capable of repetition, yet evading review" inquiry, the Center has stated that it "has spoken out on public issues in Louisiana in the past and plans to do so in the future." Complaint ¶ 3(b). Thus, the Center may again feel the need to censor itself to avoid possible application of the CFDA. The Board does not dispute the Center's assertion regarding its past and likely future activity in Louisiana, and there is no reason to doubt that claim.

Moreover, despite the Supreme Court's reminder that there must be a "reasonable expectation that the same complaining party would be subject to the same action again," *Weinstein*, 423 U.S. at 149, the Court does not always focus on whether a particular plaintiff is likely to incur the same injury. For example, in *Storer*, 415 U.S. at 737 n.8, the Court stated that "[t]he 1972 election is long over, and no effective relief can be provided to the candidates or voters, but this case is not moot, since the issues properly presented, and their effects on independent candidacies, will persist as the California statutes are applied in future elections."

Similarly, in *Dunn v. Blumstein*, 405 U.S. 330, 333 n.2 (1972), the Court held that the exception to the mootness doctrine applied despite the fact that the plaintiff would no longer be subject to the challenged statute, because "[a]lthough [plaintiff] now can vote, the problem to voters posed by the Tennessee residence requirements is 'capable of repetition,

---

[6] *See Moore v. Ogilvie*, 394 U.S. 814, 816 (1969); *Storer v. Brown*, 415 U.S. 724, 737 n.8 (1974); *First Nat'l Bank*, 435 U.S. at 774; *Norman v. Reed*, 502 U.S. 279, 288 (1992).

5

yet evading review.'" Thus, even if it were doubtful that the Center would again attempt to engage in election-related speech in Louisiana, precedent suggests that this case is not moot, because other individuals certainly will be affected by the continuing existence of the CFDA.

III.

We review questions of law *de novo*. *See Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 601 (5th Cir. 2000). Because a facial challenge to the constitutionality of a statute presents a pure question of law, we employ that standard here as we examine the merits.

In general, to mount a successful facial attack, "the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). The requirement is different in the First Amendment context, where we recognize the overbreadth doctrine. With regard to facial First Amendment challenges, the challenger need only show that a statute or regulation "might operate unconstitutionally under some conceivable set of circumstances." *Id*.

The provisions of the CFDA relevant to the Center's claim are as follows: Louisiana Revised Statute section 18:1501.1(A) states that

[a]ny person, other than a candidate or a political committee, who makes any expenditure or who accepts a contribution, other than to or from a candidate or to or from a political committee, shall file reports if either said expenditures or said contributions exceed five hundred dollars in the aggregate during the aggregating period defined for committees.

The reports must "contain the same informa-

tion . . . as reports required of political committees," which includes "the full name and address of each person who has made one or more contributions to and which have been received and accepted by the [individual or group] during the reporting period." LA. REV. STAT. § 18:1491.7(B)(4)(a).

If an individual or organization is required to file a report and fails to do so, the CFDA authorizes civil penalties. *See id.* § 18:1505.4. If the failure to file is knowing, wilful, or fraudulent, the person required to file (either as an individual or representative of an organization) may be fined up to $500 dollars and sentenced to up to six months in prison. *See id.* § 18:1505.6(A)(2).

At the heart of the Center's challenge is the statutory definition of "expenditure." Section 18:1483(9)(a) states that an expenditure is "a purchase, payment, advance, deposit, or gift, of money or anything of value made for the purpose of supporting, opposing, or otherwise influencing the nomination or election of a person to public office." The Center contends that this definition is vague and overbroad because it could be interpreted to reach both express advocacy and issue advocacy. Because disclosure requirements burden protected political speech and subject those who do not comply to civil and criminal penalties, and because the disclosure requirements are triggered, *inter alia*, by "expenditures" in excess of $500, the Center contends that the definition is vague and overbroad and therefore violates the First Amendment.

The Board counters that because the relevant provisions of the CFDA are equivalent to the disclosure provisions in the Federal Election Campaign Act ("FECA") that were upheld in *Buckley*, the CFDA provisions are not facially unconstitutional. We agree, but only

6

by imposing the same limiting construction on the CFDA that the Court employed in *Buckley*.

## A.

The challenged provisions are similar to what the Court confronted and upheld in *Buckley*. Section 434(e) of FECA required that

> [e]very person (other than a political committee or candidate) who makes contributions or expenditures, other than by contribution to a political committee or candidate, in an aggregate amount in excess of $100 within a calendar year . . . file with the [Federal Election] Commission a statement containing the information required by this section.

*Buckley*, 424 U.S. at 160. In relevant part, FECA defined "expenditure" as "a purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made for the purpose of influencing the nomination for election, or the election, of any person to Federal office, or to the office of presidential and vice presidential election." *Id*. at 147.

The challengers in *Buckley* "attack[ed] § 434(e) as a direct intrusion on privacy of belief . . . and as imposing very real, practical burdens . . . certain to deter individuals from making expenditures for their independent political speech . . . ." *Id*. at 75. In discussing a similar requirement within the FECA, the Court agreed that disclosure requirements "can seriously infringe on privacy of association and belief guaranteed by the First Amendment" and that such requirements must therefore "survive exacting scrutiny." *Id*. at 64.

The Court held, however, that in general, disclosure requirements survive exacting scrutiny because "there are governmental interests sufficiently important to outweigh the possibility of infringement [of First Amendment rights], particularly when the free functioning of our national institutions is involved . . . . The governmental interests sought to be vindicated by the disclosure requirements are of this magnitude." *Id*. at 66. In reaching that conclusion, the Court focused on voters' need for information about candidates and their supporters to evaluate the candidates and expose corruption. *Id*. at 66-68.

Nevertheless, with regard to § 434(e), the Court stated that "the provision raises serious problems of vagueness, particularly treacherous where, as here, the violation of its terms carries criminal penalties and fear of incurring these sanctions may deter those who seek to exercise protected First Amendment rights." *Id*. at 76-77. The source of vagueness was the "for the purpose of influencing" language within the definition of expenditure, which gave the provision "potential for encompassing both issue discussion and advocacy of a political result." *Id*. at 76, 79. Due process "requires that a criminal statute provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal." *Id*. at 77. Without knowing whether the reporting requirements of § 434(e) were triggered by political advocacy, issue discussion, or both, an individual (or organization) wishing to speak out could not know whether his contemplated conduct would subject him to criminal sanction if he did not disclose the information required by FECA.

In addition, the Court held that § 434(e) was rendered potentially overbroad by the fact that it could be interpreted to require disclosure when an independent individual or group engages only in issue advocacy. The Court reasoned that if § 434(e) did cover that situation, the connection between the information

7

sought and the governmental interest in promoting clean and well-informed elections "may be too remote." *Id*. at 80.

Rather than striking § 434(e) down as unconstitutional, however, the Court imposed a limiting construction on the statute, bringing it within constitutional bounds by drawing a line between express advocacy and issue advocacy. The Court stated that "we construe 'expenditure' for purposes of [§ 434(e)] . . . to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." *Id*. Words of express advocacy include terms "such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.'" *Id*. at 44 n.52. These are the well-known "magic words."

Given that the CFDA links the disclosure requirements for expenditures made by independent individuals and groups to the same "for the purpose of influencing" language that the Court confronted and upheld in *Buckley*, we can likewise construe the CFDA in a way that saves it from constitutional infirmity. On that basis, the Center fails in its facial challenge to the constitutionality of the disclosure provisions of the CFDA.

### B.

The more difficult question, in light of *McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003), is whether we must, in circumstances such as this, continue to adhere to the express advocacy/issue advocacy dichotomy that the Court set up in *Buckley* and that we employed in *Chamber of Commerce of the United States v. Moore*, 288 F.3d 187, 194-95 (5th Cir. 2002). In *McConnell* the Court held that for purposes of regulating election-related speech, there is no constitutionally-mandated line that must be drawn between express advo-

cacy and issue advocacy. "Speakers," the Court stated, do not "possess an inviolable First Amendment right to engage in the latter category of speech." *McConnell*, 540 U.S. at 190. The Court further asserted that

> a plain reading of *Buckley* makes clear that the express advocacy limitation, in both the expenditure and the disclosure contexts, was the product of statutory interpretation rather than a constitutional command. In narrowly reading the FECA provisions in *Buckley* to avoid problems of vagueness and overbreadth, we nowhere suggested that a statute that was neither vague nor overbroad would be required to toe the same express advocacy line.

*Id*. at 192.

The Board contends that *McConnell* eliminates completely the express advocacy/issue advocacy delineation and in its place provides a more holistic, "practical" approach to determining whether expenditures have been made for the purpose of influencing an election and therefore, consistent with the First Amendment, can be subject to regulation. That reading of *McConnell* is incorrect. *McConnell* states only that a campaign finance regulation can cover issue advocacy and nevertheless be constitutional so long as the regulation is "closely drawn" to match a "sufficiently important" government interest, *id*. at 135, and is not vague. The Court has not provided a broader approach to determining when expenditures have been made for the purpose of influencing an election.

Instead, the Court has stated that *legislatures* may employ standards other than a bright-line distinction between express and issue advocacy as long as they are precise in regard to the types of activities that will subject

an individual or group to regulation. With regard to the particular provision at issue in *McConnell*, for example, the Court held that new FECA § 304(f)(3)'s definition of "electioneering communication" "raises none of the vagueness concerns that drove our analysis in *Buckley*," because the term

> applies only (1) to a broadcast (2) clearly identifying a candidate for federal office, (3) aired within a specific time period, and (4) targeted to an identified audience of at least 50,000 viewers or listeners. These components are both easily understood and objectively determinable. Thus, the constitutional objection that persuaded the Court in *Buckley* to limit FECA's reach to express advocacy is simply inapposite here.

*Id*. at 194.

*McConnell* does not obviate the applicability of *Buckley*'s line-drawing exercise where, as in this case, we are confronted with a vague statute. *See Anderson v. Spear*, 356 F.3d 651, 664-65 (6th Cir. 2004). The flaw in the CFDA is that it *might* be read to cover issue advocacy. Following *McConnell*, that uncertainty presents a problem not because regulating such communications is *per se* unconstitutional, but because it renders the scope of the statute uncertain.

To cure that vagueness, and receiving no instruction from *McConnell* to do otherwise, we apply *Buckley*'s limiting principle to the CFDA and conclude that the statute reaches only communications that expressly advocate the election or defeat of a clearly identified candidate. In limiting the scope of the CFDA to express advocacy, we adopt *Buckley*'s defi-

nition for what qualifies as such advocacy.[7] As so limited, the challenged provisions of the CFDA are facially constitutional.

The judgment of dismissal is AFFIRMED.

---

[7] We are aware of the *McConnell* Court's assertions, 540 U.S. at 193-94, that "the presence or absence of magic words cannot meaningfully distinguish electioneering speech from a true issue ad," that "*Buckley*'s magic-words requirement is functionally meaningless," and that "*Buckley*'s express advocacy line . . . has not aided the legislative effort to combat real or apparent corruption." Those statements, however, were made in the context of the Court's determination that a distinction between express advocacy and issue advocacy is not constitutionally mandated. The Court said nothing about the continuing relevance of the magic words requirement as a tool of statutory construction where a court is dealing with a vague campaign finance regulation.

In light of that silence, we must assume that *Buckley* remains good law in such circumstances. If the State of Louisiana agrees with the Court that the magic words requirement is "functionally meaningless," then pursuant to *McConnell* it is free to amend the CFDA in the same way that Congress altered the FECA.

9

DENNIS, Circuit Judge, dissenting:

Because the majority opinion (1) construes key provisions of the Louisiana Campaign Finance Disclosure Act, La. R.S. 18:1501.1(A) and 18:1483(9)(a), without first certifying the *res nova* state law questions implicated to the state's highest court as urged by the Supreme Court, (2) disregards the Supreme Court's clear holdings in *McConnell v. Federal Election Commission*, 540 U.S. 93 (2003) that (i) the First Amendment permits a campaign disclosure law to require the names and addresses of persons who fund a television or radio broadcast that clearly identifies a candidate within 30 days of a primary and is targeted to the relevant electorate, and (ii) when a federal court imposes a narrowing statutory construction, it must never formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied, and (3) saddles the State of Louisiana with a marginalized and ineffective campaign financial disclosure law that is incongruous with the intent of the Louisiana Legislature and the requirements of the First Amendment, I respectfully dissent.

## BACKGROUND

The Center for Individual Freedom (the "Center"), a Virginia non-profit corporation, brought this action under the Civil Rights Act, 42 U.S.C. § 1983, and the Declaratory Judgment Act, 28 U.S.C. § 2201, in the federal district court against the individual members of the Louisiana Board of Ethics to have the Louisiana Campaign Finance Disclosure Act (the "CFDA") either declared unconstitu-

10

tional on its face or to have the CFDA's disclosure and record-keeping provisions narrowly construed, just as the Supreme Court in *Buckley v. Valeo*, 424 U.S. 1 (1976), limited the disclosure provision of the Federal Election Campaign Act ("FECA"), to apply only to persons making expenditures for communications that expressly advocate the election or defeat of a clearly identified candidate, *i.e.*, to communications containing express words of advocacy of election or defeat ("magic words"), such as "vote for," "elect," "support," "cast your ballot for," "Smith for Congress," "vote against," "defeat," "reject." *Id.* at 44, n.52.

The Center alleges that it desired to finance radio and television broadcasts on "judicial decision-making" issues, *inter alia*, during the last three weeks of a campaign for the September 18, 2004 primary election of an Associate Justice of the Louisiana Supreme Court targeted to the relevant multi-parish district electorate. The Center contends that it was prepared to run television and radio ads referring to the two candidates as illustrating positions for and against its own viewpoint without expressly advocating the election or defeat of either; that it ultimately chose not to do so because it feared that its funding of the broadcasts easily could have been interpreted as expenditures for the purpose of supporting, opposing, or influencing the election of a person to public office, for which the CFDA would have required the Center to disclose and report the names and

11

addresses of its contributors funding the broadcasts; and that the CFDA is unconstitutionally vague and overbroad because it does not clearly guarantee such persons the right to anonymously fund such broadcasts in the most effective way, *viz.*, by advocating their issue positions while referring to candidates illustrating agreement or opposition to those positions in communications targeted to the relevant electorate during the last few weeks of a primary election campaign.

The majority grants the Center's request to graft *Buckley*'s limiting magic words construction on to the CFDA. The majority's reasoning is that: (1) the CFDA is vague because it requires disclosure when persons make expenditures for the purpose of influencing the election of a person to public office similar to the FECA provision that the Supreme Court found vague and in need of the limiting construction imposed in *Buckley*; (2) the Supreme Court in *McConnell* held that the Bipartisan Campaign Reform Act of 2002 (the "BCRA")'s definition of "electioneering communication" as a disclosure trigger was not vague because it consisted of easily understood and objectively determinable components, *viz.*, expenditure funding of (i) a broadcast (ii) clearly identifying a candidate (iii) aired within a specific time period (iv) and targeted to the relevant electorate; (3) therefore, *McConnell* has no application whatsoever, express or implicit, to a case involving a vague statute like the CFDA; (4) "To cure [the CFDA's] vagueness,

12

and receiving no instruction from *McConnell* to do otherwise, we apply *Buckley*'s limiting principle to the CFDA[.]"

DISCUSSION

1. Certification

The meaning of the disclosure provision of the CFDA is *res nova;* it has never been authoritatively interpreted by the Louisiana Supreme Court. Although federal courts generally have a duty to adjudicate federal questions properly before them, the Supreme Court has long recognized that concerns for comity and federalism may require federal courts to either abstain from deciding federal constitutional issues that are entwined with the interpretation of state law or certify the questions of state law to the state's highest court for an authoritative interpretation of them before reaching the merits of the cases. In *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 501 (1941), the Court held that where uncertain questions of state law must be resolved before a federal constitutional question can be decided, federal courts should abstain until a state court has addressed the state questions. *See also Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 236-237 (1984). This doctrine of abstention acknowledges that federal courts should avoid the unnecessary resolution of federal constitutional issues and that state courts provide the authoritative adjudication of questions of state law.

Attention to the policies underlying abstention makes clear that in

the circumstances of these cases, a federal court should await a definitive construction by a state court rather than precipitously indulging in a facial challenge to the constitutional validity of a state statute.  The First Amendment overbreadth doctrine allows a challenge to the validity of a statute on its face only if the law is substantially overbroad. *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 799-801 (1984); *New York v. Ferber*, 458 U.S. 747, 769-773 (1982).  Thus, analysis of the constitutional claims advanced by the Center necessarily requires construction of the CFDA to assess its scope. *Id.* at 769, n. 24; *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 618, n. 16 (1973). ("[A] federal court must determine what a state statute means before it can judge its facial constitutionality"; application of the overbreadth doctrine is "strong medicine" and is "employed by the Court sparingly").  Where provisions of a state statute have never been construed or applied by the state's highest court, it seems rather obvious that interpretation of those statutory provisions by that court could substantially alter the resolution of any claim that the statute is facially invalid under the Federal Constitution.  *See Harmon v. Forssenius*, 380 U.S. 528, 535 (1965)(explaining that abstention may be necessary where the statute at issue is "subject to an interpretation which will render unnecessary or substantially modify" this Court's decision once the state court has been allowed to construe the statute).

14

The United States Supreme Court has encouraged the use of state certification procedures as an alternative to "the more cumbersome and...problematic abstention doctrine." *See Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 397 (1988). The purpose of certification is to obtain the benefit of an authoritative construction from the state's highest court before proceeding to the merits of the dispute. The state court's interest in accepting a certified question for review is particularly strong when it has not yet had the opportunity to interpret the pertinent statutory language. *Id*. at 397. Through certification of novel or unsettled questions of state law for authoritative answers by a State's highest court, a federal court may save "time, energy, and resources and help[] build a cooperative judicial federalism." *Lehman Brothers v. Schein*, 416 U.S. 386, 391 (1974); *see also Bellotti* v. *Baird*, 428 U.S. 132, 148 (1976) (to warrant district court certification, "[i]t is sufficient that the statute is susceptible of...an interpretation [that] would avoid or substantially modify the federal constitutional challenge to the statute"). Taking advantage of certification made available by a State may "greatly simplif[y]" an ultimate adjudication in federal court. *See Bellotti*, 428 U.S. at 151.

"Speculation by a federal court about the meaning of a state statute in the absence of prior state court adjudication is particularly gratuitous when...the state courts stand willing to

15

address questions of state law on certification from a federal court." *Id*. (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 510 (1985)(O'CONNOR, J., concurring)); *see Arizonans for Official English v. Arizona*, 520 U.S. 43, 79 (1997)("Warnings against premature adjudication of constitutional questions bear heightened attention when a federal court is asked to invalidate a State's law, for the federal tribunal risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court.")(citing *Rescue Army v. Municipal Court of City of Los Angeles*, 331 U.S. 549, 573-574). This is especially true in the context of a state campaign finance disclosure law applicable to all state primary and general elections, including those for the Legislature, the Governor, and other Executive Branch officers, as well as the Supreme Court of Louisiana and many other important offices. The State of Louisiana, as well as all of the other United States, has a great interest in promoting genuinely democratic elections to fill its major public offices free from corruption and other undue influences. For these reasons, the Louisiana Supreme Court should have been afforded an opportunity to construe the Louisiana Campaign Finance Disclosure Act in the first instance.

2. *Buckley* Is Out; *McConnell* Is In:
Requiring Disclosure Of Expenditures On
Electioneering-Type Communications Is Permissible

Unfortunately, the majority not only fails to certify the

question of the meaning of the state statute to the state supreme court, it also proceeds through an incorrect interpretation of federal law to superimpose an erroneous and overly intrusive narrowing construction on the state law.

In *Buckley*, the Supreme Court concluded that the FECA's disclosure requirement, in its effort to be all-inclusive, raised serious problems of vagueness because it applied to every person who made a contribution or expenditure for the purpose of influencing the nomination or election of a candidate for federal office. 424 U.S. at 76-77. Thus, the subjective intent of the contributor was the primary controlling factor in triggering the disclosure requirement. Because almost any contribution funding a political communication, even if made well prior to the election and without mention of any candidate's name, could be deemed to have been made to influence an election, the potential reach of the FECA disclosure provision was extremely broad. Thus, to insure that the reach of the disclosure requirement was not impermissibly broad, the Court construed "expenditure" to reach only funds used for communications expressly advocating the election or defeat of a clearly identified candidate. *Id.* at 44. The Court suggested that there existed "magic words" of express advocacy of election or defeat of a candidate, which were necessary to make communications subject to the disclosure requirement. *Id.* at 44, n. 52.

In contrast, the Supreme Court in *McConnell* upheld without

17

limitation the clear and objective BCRA requirement of disclosure of the names and addresses of persons funding an electronic media broadcast made within a 30- or 60-day window prior to a primary or general election, if it clearly identified a candidate and targeted the relevant electorate. 540 U.S. at 105 (explaining that "issues ads broadcast during the 30- and 60-day periods preceding federal primary and general elections are the functional equivalent of express advocacy" and "[t]he justifications for regulating express advocacy apply equally to those ads if they have an electioneering purpose, which the vast majority do"). In drafting the BCRA provision, Congress relied on almost 30 years' experience which taught that the *Buckley* "magic words" limitation was functionally meaningless: under *Buckley* political advertisers easily evaded disclosure by simply eschewing use of the magic words; the outcomes of elections were often influenced by enormous sums spent anony-mously to fund TV and radio advertising in the final campaign stages; on the other hand, electronic media advertising during such periods that clearly identified a candidate and targeted the relevant electorate rarely, if ever, was funded for any other purpose than to influence elections. *Id.* at 189-94.

Thus, the *McConnell* Court explained, the amount of pure issue electronic media advocacy that might be chilled during a specified campaign homestretch was negligible in comparison with the beneficial effects of public disclosure of the identities of the

funders of such electronic electioneering communications. *Id.* at 196 (agreeing that "the important state interests" upheld through disclosure requirements are "providing the electorate with information, deterring actual corruption and avoiding any appearance thereof, and gathering the data necessary to enforce more substantive electioneering restrictions"). In fact, the *McConnell* Court agreed with the lower court that "disclosure requirements are constitutional because they do not prevent anyone from speaking." *Id.* at 201 (citation omitted). The Court flatly rejected the plaintiffs' argument that *Buckley* established that the First Amendment absolutely guaranteed the right of persons to anonymously engage in political speech for the purpose of issues advocacy under any and all circumstances. *Id.* at 190-93. The Court explained that in *Buckley* it had merely adopted a narrowing construction of the FECA to avoid a potential constitutional conflict; it did not adopt the Buckley express advocacy limitation and magic words implementation as a freestanding commandment of the First Amendment. *Id.* Moreover, in doing so, the *McConnell* Court reaffirmed that it had long rigidly adhered to the tenet never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied, *id.* at 192 (citing *U.S. v. Raines*, 362 U.S. 17, 21 (1960); and that the nature of judicial review constrains a federal court to consider only the case that is actually before it. *Id.* (citing *James B. Beam Distilling Co. V.*

19

*Georgia*, 501 U.S. 529, 547 (1991)(Blackmun, J., dissenting)).

For these reasons, the majority in the present case has clearly misinterpreted the *McConnell* decision and has misapplied it in engrafting *Buckley*'s limiting construction on to the Louisiana Campaign Finance Disclosure Act. Assuming, without deciding, that the majority has correctly guessed how the Supreme Court of Louisiana would interpret the CFDA, and that the CFDA is unconstitutionally vague as so construed, it clearly does not follow that the majority has adopted a narrowing construction that is appropriate in the light of the Supreme Court's holdings and teachings in *McConnell*. On the contrary, the majority's limiting interpretation of the CFDA would be acceptable only under the theory that the Court in *Buckley* had constitutionalized the express advocacy limitation and magic words prescription, a constitutional theory that the Court expressly rejected in *McConnell*.

Instead, the Supreme Court's decision in *McConnell* clearly indicates that the State of Louisiana may constitutionally require the Center to comply with the disclosure requirements of the CFDA under a construction that is no broader than is required by the precise facts to which it is to be applied in the present case. In this case, the Center asserts that it desired only to engage in issue advocacy, and that the TV and radio advertising it proposed to broadcast during the three weeks prior to the September 18, 2004 Louisiana Supreme Court Associate Justice election, would not have

20

been funded or broadcast for the purpose of influencing the election. But the Center admitted that its broadcasts would clearly identify one or more candidates and be targeted to the relevant electorate. Consequently, the broadcasts that the Center desired to fund fall squarely within a category of speech closely analogous to the definition of "electioneering communication" in respect to which the Supreme Court held that Congress may under the First Amendment require disclosure, *viz.* (1) a broadcast (2) clearly identifying a candidate (3) aired within a specific time prior to election, and (4) targeted to the relevant electorate. *McConnell*, 540 U.S. at 194.

### 3. The Majority Opinion Formulates A Constitutional Rule Broader Than The Facts Of This Case

In order to reduce the scope of the CFDA to a constitutional scale it is only necessary to construe it so as to limit its disclosure requirement to the names and addresses of those who fund electronic media broadcasts, clearly identifying a candidate, aired within three weeks prior to a primary election, and targeted to the relevant electorate. The majority opinion, however, in disregard of *McConnell*, grafts the *Buckley* express advocacy/magic words limitation on to the CFDA, tacitly formulating and applying a much broader rule that nullifies the CFDA's disclosure requirement in respect to all political speech except for that containing the *Buckley* magic words of express candidate advocacy. Thus, the majority opinion violates the tenet of the Supreme Court, as

21

reaffirmed in *McConnell*, against the formulation of a constitutional rule broader than the precise facts of the case to which it applies.[1]

Consequently, the majority is simply mistaken in assuming that the *McConnell* Court's holdings have no effect upon "the continuing relevance of the magic words requirement as a tool of statutory construction where a court is dealing with a vague campaign finance regulation." The majority's assumption rests precariously on a false syllogism, *viz.*, *McConnell* dealt with an unambiguous statute; the present case deals with an ambiguous statute (according to the majority's necessarily non-authoritative state law interpretation); therefore, nothing *McConnell* says bears upon our narrowing construction of a state statute. Only a moment's reflection is needed to see the fallacy of this sophism. The Supreme Court has developed First Amendment principles that it has applied to determine whether any particular statute is constitutionally ambiguous and in need of a narrowing construction. Therefore, the Court's teachings on the First Amendment in such cases are generally authoritative and binding upon the inferior federal courts regardless of the court's conclusion as to whether the statute in the particular case before it is found to be ambiguous and in need of a narrowing construction. Thus, the majority cannot legitimately disregard the teachings of the *McConnell* Court as irrelevant "assertions," as it seeks to do, simply because the Court determined that the statute in that case was not ambiguous and the majority has decided the case before us is ambiguous.

---

[1] Although the majority does not disclose the constitutional rule supporting its narrowing construction of the CFDA, the majority must have tacitly formulated such a rule. For without a constitutional rule as a basis this court has no authority to narrowly construe state statutes.

22

Therefore, the majority erred in concluding that it must "continue to adhere to the express advocacy/issue advocacy dichotomy that the Court set up in *Buckley* and that we employed in *Chamber of Commerce of the United States v. Moore*, 288 F.3d 187, 194-95 (5th Cir. 2002)." Further, as Justice Thomas aptly recognized, the *McConnell* Court, "by concluding that the 'express advocacy' limitation derived by *Buckley* is not a constitutionally mandated line, has, in one blow, overturned every Court of Appeals that has addressed this question" including, *inter alia*, *Chamber of Commerce of the United States v. Moore*, *supra*., on which the majority erroneously relies. 540 U.S. at 278, n.11 (Thomas, J., dissenting)

## CONCLUSION

For these reasons, I respectfully dissent. The majority erred in refusing to certify the *res nova* state law questions implicated in the interpretation of the CFDA to the Louisiana Supreme Court. The majority further erred in disregarding the holdings and teachings of *McConnell* which require, at the most, limiting the CFDA's disclosure requirement to a category of political speech analogous to that defined as "electioneering communication" by Congress in the BCRA that the *McConnell* Court upheld. Finally, the majority erred needlessly and most harmfully in grafting on to the CFDA the *Buckley* magic words of express candidate advocacy, thereby nullifying the CFDA's disclosure requirement except in those rare instances in which political speakers fail to eschew the magic words. Ultimately, I believe that this case would be more properly decided by the Louisiana Supreme Court. For these reasons, I respectfully dissent from the majority's decision.