REVISED APRIL 15, 2002

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-60779

_____

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

MIKE MOORE, Attorney General, State of Mississippi; ERIC CLARK, Secretary of State, State of Mississippi,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Mississippi
_____

April 5, 2002

Before JOLLY and PARKER, Circuit Judges, and MILLS,[*] District Judge.

E. GRADY JOLLY, Circuit Judge:

This appeal of a declaratory judgment by the Chamber of Commerce of the United States of America involves the First Amendment and state regulation of political advertisements aired shortly before the election for members of the Mississippi Supreme Court. During the 2000 election season, the Chamber ran four television commercials describing the background and qualifications of candidates seeking positions on the court. The defendant state officials initiated a review of the advertisements to determine

_____

[*]District Judge of the Central District of Illinois, sitting by designation.

whether they were subject to a Mississippi statute that requires the disclosure of "independent expenditures" that "expressly advocate" the election or defeat of a specific candidate. In response, the Chamber sought a declaratory judgment that its advertisements were not subject to the disclosure law. The district court, in a thoughtful and reasoned opinion, held that the advertisements were subject to state regulation because reasonable minds could not differ that the advertisements advocate the election of the specified candidates.

The Supreme Court has held that the First Amendment permits regulation of political advertisements, but only if they *expressly* advocate the election or defeat of a specific candidate. There is some disagreement, however, concerning the standard to be applied in determining whether a given advertisement contains "express advocacy." Today we follow most Courts of Appeal that have considered the issue. We hold that a state may regulate a political advertisement only if the advertisement advocates *in express terms* the election or defeat of a candidate. Applying this rule to the present case, we conclude that the Chamber's advertisements do not expressly advocate the election or defeat of a candidate. This is true because the advertisements do not contain explicit terms advocating specific electoral action by viewers. As a consequence, the advertisements are not subject to mandatory disclosure requirements for independent campaign

2

expenditures.  Accordingly, we reverse the judgment of the district court.

I

In November 2000, four of the nine positions on the Mississippi Supreme Court were up for election.  Less than one month before the election, the Chamber ran four thirty-second television advertisements, each extolling the virtues of a different candidate running for a position on the court.  The advertisements featured three incumbents (former Chief Justice Lenore Prather, Justice Kay Cobb, and Justice James Smith) and one challenger (Judge Keith Starrett).  The advertisements identified the candidate and described in general terms the candidate's judicial philosophy, background, qualifications, and other positive qualities.  For example, the advertisements emphasized the candidates' "common sense" and their interest in protecting "victims' rights."[1]  The advertisements concluded by displaying the

---

[1] The audio portion of the advertisement featuring former Chief Justice Prather is typical:

> Lenore Prather – Chief Justice of Mississippi's Supreme Court.
>
> Lenore Prather – Using common sense principles to uphold the law.
>
> Lenore Prather – Putting victims rights ahead of criminals and protecting our Supreme Court from the influence of special interests.
>
> The first woman appointed to Mississippi's Supreme Court, Lenore Prather has 35 years experience on the bench.

address of an Internet web site, www.LitigationFairness.org, that contains a page with links to the campaign web sites of Justice Cobb and Judge Starrett and to pages containing biographical information for Justice Smith and former Chief Justice Prather.[2]

The election process for positions on the Mississippi Supreme Court is governed by Mississippi's election laws, which include regulations requiring reporting and disclosure of "independent expenditures" on candidates' campaigns. See MISS. CODE. ANN. §§ 23-15-801 et seq. Because the Chamber did not report its expenditures on the advertisements to state election authorities, the Mississippi Attorney General and Secretary of State initiated an investigation to determine whether the advertisements violated the state election laws.[3] The Chamber brought an action in the District Court for the Southern District of Mississippi seeking declaratory relief from the application of the election regulations. The Chamber argued that application of the state regulations to its advertisements would impermissibly curtail its right to free speech.

---

   Lenore Prather. A fair and independent voice
   for Mississippi.

[2] The link for Justice Smith directs the viewer to a page on the Litigation Fairness site describing Justice Smith's background. The link for former Chief Justice Prather directs the viewer to her biography on the Mississippi Supreme Court web site.

[3] The state acknowledges that there is no evidence that the Chamber colluded with any of the candidates in developing the advertisements.

The district court adopted a test first articulated by the Ninth Circuit in Fed. Election Comm'n v. Furgatch, 807 F.2d 857 (9th Cir. 1987). It held that the advertisements were "express advocacy" because, in the context of the ongoing election campaign, no reasonable viewer would construe the advertisements as anything but a directive to vote for the featured candidates -- notwithstanding that the advertisements' express words did not call for action on the part of the voter. The district court specifically found that the advertisements "clearly champion[] the election of a particular candidate" and "contain no true discussion of issues." It thus held that the Chamber's advertisements could be subject to state campaign regulations without offending the First Amendment. The Chamber now appeals.

II

Because the Chamber's challenge to Mississippi's mandatory disclosure statute follows a well-worn path, we begin with a brief discussion of the applicable caselaw. Our review of the Supreme Court decisions in this area leads us to the conclusion that mandatory disclosure provisions like that in the Mississippi statute apply only to communications containing words that *explicitly* advocate the election or defeat of a particular candidate. Because the advertisements at issue here do not contain such express advocacy, we conclude that the First Amendment

5

protects these advertisements from governmental regulation.

A

Although the states, like the federal government, have authority to regulate elections and election campaigns, the Supreme Court has held that the First Amendment constrains the government's power to compel the disclosure of independent contributions and expenditures, just as it constrains the government's power to regulate the amount of money that a person or group can contribute to or spend on election campaigns. See Buckley v. Valeo, 424 U.S. 1, 19, 60-61 (1976).

In Buckley, candidates and political donors challenged the constitutionality of a federal election statute that imposed limits on individual campaign contributions, expenditures by candidates, and independent expenditures "relative to" specific candidates. Most relevant to our decision today, the Court also reviewed a provision of the statute requiring "'[e]very person (other than a political committee or candidate) who makes contributions or expenditures' aggregating over $100 in a calendar year 'other than by contribution to a political committee or candidate' to file a statement with the [Federal Election] Commission." Buckley, 424 U.S. at 74-75 (quoting 18 U.S.C. § 434(e) (1970 Supp. IV)). The Court observed that compelled disclosure of independent expenditures implicates the First Amendment because it "can seriously infringe on privacy of association and belief" and it can

6

indirectly deter the exercise of First Amendment rights.  Id. at 64-65.  The Court recognized that the government has an important interest in providing the electorate with information about the sources of money spent during political campaigns and collecting data to enforce campaign laws.  The Court nevertheless held that a provision requiring disclosure of independent campaign expenditures involves a "significant encroachment[] on First Amendment rights" and must therefore be subject to "exacting scrutiny."  Id. at 64-67; see also id. at 75 ("In considering this provision [requiring disclosure of independent expenditures by individuals or groups], we must apply the same strict standard of scrutiny, for the right of associational privacy developed in NAACP v. Alabama derives from the rights of the organization's members to advocate their personal points of view in the most effective way.").

To ensure that the mandatory disclosure provision in the federal statute did not encroach on protected political speech by individuals and groups, the Court held that the provision *must be narrowly construed* to be consistent with the First Amendment.  Id. at 80.  Accordingly, the Court interpreted the provision to "apply only to expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office."[4]  Id. at 44.  In a footnote, the Court then

---

[4] The Court articulated this standard in construing the section of the federal election statute limiting expenditures by individuals and groups "relative to a clearly identified candidate"

provided examples of terms of express advocacy: "'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.'" Id. at 44 n.52.

In Fed. Election Comm'n v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 243 (1986) ("MCFL"), the Court applied the "express advocacy" standard to a newsletter that encouraged readers to "Vote Pro-Life" and listed the names of "pro-life" candidates in the election. Observing that the "express advocacy" standard is designed "to distinguish discussion of issues and candidates from more pointed exhortations to vote for particular persons," the Court held that the newsletter contained "[j]ust such an exhortation." Id. The Court reasoned that an explicit directive to vote "pro-life" read in conjunction with named "pro-life" candidates was only "marginally less direct" than a specific exhortation to vote for the named candidates. Id. Thus, the MCFL Court extended the "express advocacy" inquiry to include consideration of the logical relationship between an express term advocating election or defeat and the names of specific candidates identified in the communication.

In reviewing the application and constitutionality of various state and federal election regulations, most Courts of Appeal have adopted the view that, under Buckley and MCFL, the government may

to $1000 per calendar year. Buckley, 424 U.S. at 39. Later in its opinion, the Court adopted this standard during its review of the statute's mandatory disclosure provision. See id. at 77-80.

8

regulate only those communications containing explicit words advocating the election or defeat of a particular candidate.[5] These courts rely primarily on <u>Buckley</u>'s emphasis on (1) the need for a bright-line rule demarcating the government's authority to regulate speech and (2) the need to ensure that regulation does not impinge on protected issue advocacy.[6]

---

[5] See <u>Faucher v. Fed. Election Comm'n</u>, 928 F.2d 468, 470-71 (1st Cir. 1991) ("Express advocacy is language which 'in express terms advocate[s] the election or defeat of a clearly identified candidate' through the use of such phrases as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' and 'reject.'" (quoting <u>Buckley</u>, 424 U.S. at 44 & n.52)); <u>Fed. Election Comm'n v. Cent. Long Island Tax Reform Immediately Comm.</u>, 616 F.2d 45, 53 (2d Cir. 1980) (en banc) (rejecting interpretation of federal election statute allowing FEC to regulate statements made "for the purpose, express or implied, of encouraging election or defeat"); <u>Fed. Election Comm'n v. Christian Action Network, Inc.</u>, 110 F.3d 1049, 1051 (4th Cir. 1997) ("[T]he Federal Election Campaign Act [can] be applied consistently with the First Amendment only if it [is] limited to expenditures for communications that literally include words which in and of themselves advocate the election or defeat of a candidate."); <u>Iowa Right to Life Comm., Inc. v. Williams</u>, 187 F.3d 963, 969 (8th Cir. 1999) ("The Supreme Court's focus was on whether the communication contains 'express' or 'explicit' words of advocacy for the election or defeat of a candidate."); <u>Citizens for Responsible Gov't State Political Action Comm. v. Davidson</u>, 236 F.3d 1174, 1187 (10th Cir. 2000) ("[C]ommunications that do not contain express words advocating the election or defeat of a particular candidate are deemed issue advocacy, which the First Amendment shields from regulation.").

[6] See, e.g., <u>Christian Action Network</u>, 110 F.3d at 1051 (noting that the <u>Buckley</u> Court "opted for the clear, categorical limitation, that only expenditures for communications using explicit words of candidate advocacy are prohibited, so that citizen participants in the political processes would not have their core First Amendment rights to political speech burdened by apprehensions that their advocacy of issues might later be interpreted by the government as, instead, advocacy of election result"); <u>Citizens for Responsible Gov't</u>, 236 F.3d at 1187 ("In order to counter the tendency of the line between protected 'issue

The sole departure from this bright-line approach among our sister circuits came in <u>Fed. Election Comm'n v. Furgatch</u>, 807 F.2d 857 (9th Cir.), <u>cert. denied</u>, 484 U.S. 850 (1987).[7]  The Ninth Circuit summarized its holding in that case:

> We conclude that speech need not include any of the words listed in Buckley to be express advocacy under the Act, but it must, when read as a whole, and with limited reference to external events, be susceptible of no other reasonable interpretation but as an exhortation to vote for or against a specific candidate.

<u>Id.</u> at 864.  The court further elaborated:

> First, even if it is not presented in the clearest, most explicit language, speech is "express" for present purposes if its message is unmistakable and unambiguous, suggestive of only one plausible meaning.  Second, speech may only be termed "advocacy" if it presents a clear plea for action, and thus speech that is merely informative is not covered by the Act.

---

advocacy' and regulable 'express advocacy' to 'dissolve in practical application,' the <u>Buckley</u> Court construed the allegedly vague statute at issue as applicable only 'to communications containing express words of advocacy of election or defeat'" (quoting <u>Buckley</u>, 424 U.S. at 44 & n.52)); <u>Iowa Right to Life Comm.</u>, 187 F.3d at 969 ("To avoid uncertainty . . . the Supreme Court in <u>Buckley</u>, established a bright-line test. . . .").

[7] One district court and several state courts have also applied this approach. <u>See, e.g.,</u> <u>Elections Bd. of State of Wis. v. Wisconsin Mfrs. & Commerce</u>, 597 N.W.2d 721, 732 (Wis. 1999); <u>Osterberg v. Peca</u>, 12 S.W.3d 31, 53 (Tex. 2000); <u>Federal Election Comm'n v. Nat'l Organization for Women</u>, 713 F.Supp. 428, 433 (D.D.C. 1989); <u>cf.</u> <u>Federal Election Comm'n v. Christian Coalition</u>, 52 F.Supp.2d 45, 63-64 (D.D.C. 1999) (holding that "[a]lthough the implicit message is unmistakable, in explicit terms [a statement in a fundraising letter] is prophecy rather than advocacy" and that a "scorecard" was not express advocacy because "a reasonable person could understand [the] statement to be a directive to engage in issue advocacy").

10

> Finally, it must be clear what action is
> advocated.  Speech cannot be "express advocacy
> of the election or defeat of a clearly
> identified candidate" when reasonable minds
> could differ as to whether it encourages a
> vote for or against a candidate or encourages
> the reader to take some other kind of action.

Id.[8]  Although the Ninth Circuit's approach does not stray far from other articulations of the "express advocacy" standard, it does introduce two elements not present in the limited inquiry endorsed by the other circuits:  (1) "limited reference" to the context of the communication and (2) reference to whether "reasonable minds" could differ about the meaning of the communication.

These aspects of the Ninth Circuit's approach in Furgatch were essentially rejected by courts that adopted the bright-line rule requiring explicit words directing viewers to vote for or against a particular candidate.  For example, in Virginia Society for Human Life, Inc. v. Fed. Election Comm'n, 263 F.3d 379, 392 (4th Cir. 2001), the Fourth Circuit found a federal regulation unconstitutionally overbroad because it defined express advocacy as a communication that, when taken as a whole, "'could only be interpreted by a reasonable person as containing advocacy of the election or defeat of one or more clearly identified candidate(s).'"  The court held that "[t]he regulation goes too far

---

[8]  The Furgatch Court applied this analysis to a newspaper advertisement against then-President Jimmy Carter urging readers "Don't let him do it."  The court concluded that the advertisement was express advocacy when read in context because "reasonable minds could not dispute that [the] advertisement urged readers to vote against Jimmy Carter."  Furgatch, 807 F.2d at 864.

11

because it shifts the determination of what is 'express advocacy' away from the words 'in and of themselves' to 'the unpredictability of audience interpretation.'" Id. at 392. The Eighth Circuit reached a similar conclusion when it found that an election regulation defining express advocacy according to "what reasonable people or reasonable minds would understand by the communication" was unconstitutional because the regulation "does not require express words of advocacy." Iowa Right to Life, 187 F.3d at 969.

We agree that the Furgatch test is too vague and reaches too broad an array of speech to be consistent with the First Amendment as interpreted in Buckley and MCFL.[9] Instead, we iterate that the language of the communication must, by its express terms, exhort the viewer to take a specific electoral action for or against a particular candidate. See Buckley, 424 U.S. at 44 (interpreting federal election statute to "apply only to expenditures for communications that *in express terms* advocate the election or defeat of a clearly identified candidate" (emphasis added)). Although application of this rule may require making

_____

[9] We also reject amici's definition of express advocacy: "[W]hen an ad contains *only* an express endorsement of a candidate's qualifications for public office . . . and contains *no* discussion of any issue as a topic worthy of its own attention, then the ad is an 'electoral' rather than 'issue' ad." This definition involves an impermissible inquiry into what issues are "worthy" topics of discussion. We also note that neither Buckley nor MCFL adopted an "express endorsement" test. Indeed, such a test necessarily would encompass communications that contain no "express terms advocat[ing] the election or defeat of a clearly identified candidate." Buckley, 424 U.S. at 44.

12

straightforward connections between identified candidates and an express term advocating electoral action (as in MCFL), the focus must remain on the plain meaning of the words themselves.

We must admit, as the Furgatch Court correctly observed, that this narrow interpretation of "express advocacy" undoubtedly allows individuals and organizations to circumvent electoral regulations simply by omitting from their communications the genre of words and phrases that convey the same meaning as the words listed in Buckley.  This observation, however, does not affect our reading of Buckley.  Indeed, the Buckley Court recognized, for example, that confining the federal limitation on expenditures in this manner "undermines the limitation's effectiveness as a loophole-closing provision by facilitating circumvention by those seeking to exert improper influence upon a candidate or office-holder."  Buckley, 424 U.S. at 45.  The Court's overriding concern, however, was that a statute with an ambiguous scope would chill political discourse:

> "[T]he supposedly clear-cut distinction between discussion, laudation, general advocacy, and solicitation puts the speaker in these circumstances wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning.  Such a distinction offers no security for free discussion.  In these conditions it blankets with uncertainty whatever may be said.  It compels the speaker to hedge and trim."

Id. at 43 (quoting Thomas v. Collins, 323 U.S. 516, 535 (1945)). To avoid this result, the Court emphasized the need for a clear

13

line between regulated and unregulated speech under the statute. The Court adopted an "express advocacy" standard focusing on the explicit language of the communication because "the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application." Id. at 42.[10]

In sum, we believe that a narrow interpretation of "express advocacy" is faithful to the language and spirit of Buckley and MCFL. It clearly avoids the pitfalls of making application of the First Amendment dependent on the understanding of the reasonable person under the circumstances.[11] Accordingly, we hold that a communication constitutes "express advocacy" -- and may therefore be subject to mandatory disclosure regulations -- only if it contains explicit words advocating the election or defeat of a clearly identified candidate.

---

[10] See also Iowa Right to Life, 187 F.3d at 969 (recognizing the State's concern "that persons or organizations will surreptitiously advocate the election or defeat of a named candidate but avoid legitimate government regulation and reprisal by simply omitting 'magic words' of advocacy" but concluding that a bright-line test is required to avoid chilling free speech).

[11] The present case provides a good example of such pitfalls. In order to find that the advertisements here were subject to state regulation, the district court had to draw a distinction between the content of the advertisements and the court's view -- as thoughtful as it may be -- of "true issue advocacy." Chamber of Commerce v. Moore, No. 3:00-CV-778WS, slip op. at 26 (S.D.Miss. Nov. 2, 2000); see also Furgatch, 807 F.2d at 864 (concluding that an advertisement was not "issue-oriented speech" because it "directly attacks a candidate, not because of any stand on the issues of the election, but for his personal qualities and alleged improprieties in the handling of his campaign").

14

We now turn to apply these principles to this case. The Mississippi election statute at issue here provides that each person who makes aggregate "independent expenditures" of more than $200 during a calendar year must file a report with the state disclosing the amount and source of the expenditure and a statement that the expenditure was not made in cooperation with a candidate. See MISS. CODE ANN. § 23-15-809. "Independent expenditures" are defined in the statute as "expenditure[s] by a person expressly advocating the election or defeat of a clearly identified candidate which [are] made without cooperation or consultation with any candidate or any authorized committee or agent of such candidate." MISS. CODE ANN. § 23-15-801(j). Because the Mississippi legislature essentially adopted the language of the Supreme Court's decisions in Buckley and MCFL in drafting this statute, all that remains is to determine whether the Chamber's advertisements constitute "express advocacy" under the standard articulated above.

There is no question that the Chamber's advertisements do not contain any of the phrases that Buckley cites as examples of "express advocacy." Nor do the advertisements contain other explicit words advocating the election of the featured candidates or exhorting viewers to take specific electoral action during the elections. Indeed, the advertisements do not refer at all to the impending elections.

15

Amici nevertheless argue that the Chamber's advertisements are express advocacy because their "express content, when considered as a whole, unambiguously constitutes an endorsement of a particular candidate for public office." Observing that neither Buckley nor MCFL requires "succinct advocacy," amici argue that the advertisements' references to positive attributes of specific candidates are sufficient to bring the advertisements within the scope of the statute -- despite the absence of explicit words directing viewers to take a specific action.[12] The State and amici also point out that the advertisements presented only favorable information about the candidates. Because the "essential nature" of each advertisement is an endorsement of the named candidate, amici contend that the advertisements may be subjected to disclosure requirements without offending the First Amendment.

We think it is clear that the examples of express advocacy listed in the Buckley footnote are illustrative rather than exhaustive because there are a variety of other words and phrases that convey precisely the same meaning.[13] But *express* advocacy

---

[12] Amici also argue that the advertisements must be express advocacy because they do not meaningfully discuss public issues and thus cannot be considered issue advocacy. This argument incorrectly assumes that express advocacy is defined as the absence of issue advocacy. As explained above, the nature of the language in the communication -- that is, the presence or absence of explicit words advocating the election or defeat of a specific candidate -- determines whether it constitutes issue advocacy or express advocacy.

[13] Cf. Christian Coalition, 52 F.Supp.2d at 65 ("While the 'express advocacy' standard is susceptible of circumvention by all

16

necessarily requires the use of language that explicitly and by its own terms advocates the election or defeat of a candidate. If the language of the communication contains no such call to action, the communication cannot be "express advocacy." Thus, communications that discuss in glowing terms the record and philosophy of specific candidates, like the advertisements at issue here, do not constitute express advocacy under Buckley and MCFL unless they also contain words that exhort viewers to take specific electoral action for or against the candidates. Cf. Clifton v. Fed. Election Comm'n, 114 F.3d 1309, 1311 (1st Cir. 1997) ("[A]s glossed by the Supreme Court to avoid 'overbreadth' [in MCFL], the [federal election] statute does not prevent corporations and unions from engaging in issue advocacy including publication of the records and positions of federal election candidates.").

The state emphasizes that the Chamber's advertisements aired on the eve of the elections for the supreme court and were virtually identical to the candidates' own advertisements -- except that they omitted the phrase "vote for [the featured candidate]," which appeared at the end of the candidates' advertisements. The state contends that these facts, viewed together with the content of the Chamber's advertisements, supports its position that the

_____

manner of linguistic artifice, merely changing the verb 'vote' into the noun, 'trip to the voting booth' is insufficient to escape the limited reach of 'express advocacy.'"); Furgatch, 807 F.2d at 863 (noting that the phrases listed in Buckley "do[] not exhaust the capacity of the English language to expressly advocate the election or defeat of a candidate").

17

advertisements constitute express advocacy. Indeed, amici argue that the advertisements "make no sense except in the context of an election campaign." We do not necessarily gainsay this observation.

As the above discussion makes clear, however, these contextual factors are irrelevant to our determination whether the advertisements contain express advocacy. The Court in MCFL did not rely on the factual context in which the communication was made in determining whether it contained express advocacy.[14] Instead, it held that courts reviewing a communication may consider the logical relationship between an *express term* advocating specific electoral action and the names of candidates clearly identified in the communication. We therefore do not believe that MCFL retreated from the requirement that express advocacy must contain explicit words advocating electoral action. See MCFL, 479 U.S. at 249 (noting that Buckley concluded that "a finding of 'express advocacy' depended upon the use of language such as 'vote for,' 'elect,' 'support,' etc."). In any event, even under the test articulated in Furgatch, the timing of the advertisements (or other contextual factors) cannot transform general informational

---

[14] The state suggests that the MCFL Court took timing into account in its review of the "Special Edition" newsletter at issue in that case. While the Court did observe that the special edition was released to coincide with an election and had a higher circulation than normal editions of the newsletter, the Court did not rely on these facts in concluding that the newsletter contained express advocacy. See MCFL, 479 U.S. at 249-50.

18

statements about candidates into a call for specific electoral action.  See Furgatch, 807 F.2d at 864 ("[S]peech may only be termed 'advocacy' if it presents a clear plea for action, and thus speech that is merely informative is not covered by the Act."); see also id. at 863 ("Context remains a consideration, an ancillary one, peripheral to the words themselves.").

Amici also suggest that statements in the advertisements like "Lenore Prather -- A fair and independent voice for Mississippi" are only "marginally less direct" than "Smith for Congress," which is listed among the examples of express advocacy in Buckley. Because neither phrase includes a verb like "vote" or "elect," amici reason that both phrases depend on their context to convey meaning.  We find this argument unpersuasive because the two phrases are not synonymous:  The first connects a name to a positive character trait while the second connects a name to an elected office.  As we noted above, favorable statements about a candidate do not constitute express advocacy, even if the statements amount to an endorsement of the candidate.[15]  Even assuming that the phrases were roughly equivalent, "Smith for Congress" has an accepted meaning that does not vary with context.

---

[15] Following the logic of amici's argument, any laudatory phrase uttered in connection with a candidate's name during election season would be the equivalent of "Smith for Congress." We think that this broad interpretation of express advocacy runs counter to the Supreme Court's stated concerns about the overbreadth of government regulation of political speech.  See Buckley, 424 U.S. at 42-43, 64-67, 80.

19

In contrast, the meaning of the phrases in the advertisements could conceivably mean "vote for Candidate X" only when considered in the context of an event extraneous to the four corners of the advertisement. Because such contextual factors are irrelevant to our inquiry, the meaning of phrases such as "Judge Keith Starrett-- a common sense justice" is at best ambiguous -- unless matters outside the advertisement are taken into account -- and cannot constitute express advocacy.

Finally, the State suggests that, even if the content of the advertisements does not expressly advocate the election of the featured candidates, the web site referenced in the commercials (www.LitigationFairness.org) did so because it included a page directing viewers to two of the candidates' campaign web sites under the heading "Mississippi Candidate Information." The State argues that we must consider this form of indirect advocacy in determining whether the advertisements themselves are express advocacy. However, the LitigationFairness.org site did not itself contain any statements advocating the election or defeat of candidates. As a result, we find that the connection between the advertisements and the candidates' official sites is simply too tenuous to make the advertisements "express advocacy."

Because the Chamber's advertisements do not contain explicit words exhorting viewers to take specific electoral action for or against the featured candidates, we hold that the advertisements do

20

not constitute "express advocacy" under the bright line approach adopted above.[16]  As a consequence, the district erred in holding that the advertisements are subject to mandatory disclosure under the Mississippi election statute.

                                    III

We recognize that the result we reach in this case may be counterintuitive to a commonsense understanding of the message conveyed by the television political advertisements at issue. Nevertheless, the result is compelled by the First Amendment, as interpreted by the Supreme Court in its effort to balance the state's interest in regulating elections with the constitutional right of free speech.  Accordingly, for the foregoing reasons, we hold that the First Amendment protects the Chamber's advertisements, and consequently the advertisements are not subject to regulation under the Mississippi election statute.  Accordingly, the judgment of the district court is REVERSED and the case is REMANDED for entry of judgment for the plaintiff-appellant.

                                    REVERSED and REMANDED.

---

[16] Cf. Perry v. Bartlett, 231 F.3d 155, 159-61 (4th Cir. 2000) (finding that advertisements that were critical of certain candidates but that "but did not expressly exhort voters to take a particular electoral action" were not express advocacy, despite the fact that the sponsor admitted outside the advertisement that it sought to defeat the candidates), cert. denied, 121 S.Ct. 1229 (2001).