# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
January 10, 2020

No. 18-20780

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

STEPHEN E. STOCKMAN,

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before JOLLY, GRAVES, and HIGGINSON, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Stephen E. Stockman served four years in Congress and now faces ten years in prison. He seeks to avoid this career detour. He must admit that a jury convicted him on twenty-three felony counts after the government accused him, *inter alia*, of defrauding philanthropists and using their money to finance his personal life and political career. Acknowledging the convictions, Stockman argues, nevertheless, that prison should not be the next item on his résumé because the convictions were tainted by improper jury instructions and unsupported by the evidence. We affirm.

No. 18-20780

## I.

Stockman served two nonconsecutive terms in the United States House of Representatives, first from 1995 to 1997 and then from 2013 to 2015.  During his first term, Stockman began working with an organization called the "Leadership Institute," where he became acquainted with Jason Posey and Thomas Dodd, two members of its staff.  His relationships with these two men would grow and then wither.  Stockman employed Posey and Dodd as campaign staffers, congressional aides, and business consultants.  Their most recent roles were as witnesses against Stockman.

Posey and Dodd worked with Stockman to raise money for various "nonprofit" entities between 2010 and 2014, the period in which Stockman is alleged to have orchestrated a criminal scheme to obtain charitable donations under false pretenses and to then enrich himself with the proceeds.  Though initially named as codefendants, Posey and Dodd abandoned Stockman, pleaded guilty, and testified against him.  Their testimony helped reveal the details of the scheme, which unfolded in four parts, targeted two donors, and ultimately netted over a million dollars for Stockman and his aides.

### The 2010 Rothschild Donations

Stockman's scheme began in May 2010, when Stockman and Dodd started soliciting Stanford Z. Rothschild, Jr., an elderly donor acting through his foundation.  Over the next five months, Stockman and Dodd managed to persuade Rothschild to donate $285,000 to the Ross Center, a Section 501(c)(3)[1] nonprofit organization under Stockman's control.  Rothschild was told that his money would fund "voter education material" for Jewish voters in Florida.  Dodd testified that "voter education material[s]" are print publications that

---

[1] This case involves so-called "501(c)(3)" and "501(c)(4)" organizations.  Those designations refer to provisions of the Internal Revenue Code that give tax-exempt status to qualifying nonprofit entities.  *See* 26 U.S.C. §§ 501(c)(3)–(4).

No. 18-20780

"educate voters in the general public about public policy positions and public policy issues." Specifically, Rothschild was pitched on a book about radical Islam that would be mailed to voters in the lead-up to the 2010 midterm elections.

The deal was finalized only after Stockman assured Rothschild that his money "was to be spent for public policy [and] voter education that was 100 percent compliant with 501(c)(3) rules." With this reference to the "501(c)(3) rules," Stockman appears to have promised that he would spend Rothschild's money primarily (if not exclusively) in furtherance of the educational goals laid out in the pitch. *See* 26 U.S.C. § 501(c)(3) (tax-exempt organizations must be operated "exclusively for . . . charitable . . . or educational purposes").

But this promise soon vanished. Instead of "voter education materials," Stockman spent the 2010 Rothschild funds charitably on himself, educating himself at Disneyland and other amusement parks, at spas, and riding in hot air balloons. Stockman's charity to himself was generous; it further included paying his business expenses, including an abortive venture in South Sudan on which Stockman spent about $13,000 of the 2010 Rothschild funds. Stockman made the trip to South Sudan hoping to win a lucrative lobbying contract with a "performance bonus" that would allow him to take a percentage of any foreign aid appropriated by Congress.

Stockman failed to mail any "voter education material" as promised.

### The 2011–2012 Rothschild Donations

Stockman and Dodd were not finished with Rothschild. In 2011, Stockman decided to run for a second term in Congress. This time, rather than pitch a "voter education" project aimed at indirectly influencing elections, Stockman and Dodd requested a loan for Stockman's campaign. Rothschild refused. Instead, he agreed to give in the same manner as before, *i.e.*, to "mak[e] donations from his foundation . . . to be used for voter education in

3

No. 18-20780

accordance with the 501(c)(3) rules." Stockman again promised to honor Rothschild's wishes, so Rothschild made another series of large donations, this time totaling $165,000, to the Ross Center and Life Without Limits (another Stockman-controlled nonprofit entity).

As before, Stockman repurposed the funds. He spent thousands on personal goods, including airline tickets, fast food, and gasoline. He also diverted 80% of a $100,000 donation to his congressional campaign account. It was later reported to the Federal Election Commission (FEC) that this deposit was a personal loan from Stockman to his own campaign.

Stockman agrees that most of the 2011–2012 Rothschild funds were, in the words of his brief, "transferred to other accounts controlled by Stockman, including the account for his campaign committee." Stockman nevertheless reported in a letter to Rothschild that the funds had "helped [Life Without Limits] educate many people last year in traditional American values." The nature of those "values" was not described.

### The 2013 Uihlein Donation

In January 2013, Stockman, now a member of Congress, shifted his attention to Richard Uihlein, a Wisconsin businessman whose foundation has donated millions of dollars to nonprofit organizations that share his conservative values. Stockman and Dodd pitched Uihlein on "Freedom House," a prospective residential facility in Washington, D.C. that would house interns and provide a home base for a non-existent nonprofit called the "Congressional Freedom Foundation." Uihlein agreed to endow the project with $350,000 in seed money. The seed was not planted as promised, and the project died in silence. But the seed money survived to promote a new development in Stockman's political career: he had decided to run for the United States Senate in 2014.

4

No. 18-20780

Thus, as with the Rothschild donations, Stockman used the 2013 Uihlein funds to meet his personal and (especially) his political needs.  For example, Stockman spent over $40,000 on a plan to surveil a conservative Texas politician whom Stockman believed to be a likely opponent in a future primary. Stockman also gave thousands of dollars to his cohorts, Dodd and Posey, so that they, in turn, could "donate" the money to Stockman's Senate campaign; the donations were falsely attributed to Dodd's mother and Posey's father in FEC filings.  In sum, the 2013 Uihlein donation was spent in a long sequence of varying expenditures, including $5,000 to pay the rent on Stockman's campaign office, more than $30,000 to pay off Dodd's credit card debt, and over $20,000 to patronize a publishing business owned by Stockman's brother.

Posey testified that no money was actually spent on the project pitched to Uihlein.  Even Stockman agrees that no property was ever acquired for such a project.   Nonetheless, Stockman's team reported to Uihlein that his generosity had allowed Life Without Limits to support Freedom House.  The 2014 letter that makes this claim also goes on to advise Uihlein that his "continued support is crucial to our mission."

### The 2014 Uihlein Donation

By early 2014, Stockman was in the midst of his primary challenge to incumbent United States Senator John Cornyn.  Stockman met with Kurt Wagner, the president of a direct mail company, and the two men discussed Stockman's plan to mail Texas voters a faux newspaper called *The Conservative News* on the eve of the Republican primary.  *The Conservative News* accuses Senator Cornyn of "falsifying ethics reports to hide income," "lying to voters," and filing "false donor reports at least 121 times."  By contrast, *The Conservative News* takes care to highlight Stockman's policy positions and legislative actions with bold headlines like "Stockman Kills

5

No. 18-20780

Cornyn-Backed Senate Amnesty Bill" and "Stockman's Sanctity of Life Act Overturns *Roe v. Wade*."

To finance this direct mail campaign, Stockman instructed Wagner to seek a new donation from Uihlein. Posey also called Uihlein to help induce a donation. Stockman dictated some of the contents of a solicitation letter but told Wagner that the letter would "need[] to come from somebody else, not [Stockman] directly." The letter, which purported to seek financing for an independent expenditure by the "Center for the American Future," induced Uihlein to give $450,571.65. Uihlein testified that he would not have donated the money if he had known of Stockman's involvement. Posey testified that the Center for the American Future was under Stockman's control.

The 2014 Uihlein funds were used to print and distribute hundreds of thousands of copies of *The Conservative News*. Stockman called off the direct mail campaign shortly before the primary, at which point only $214,718.51 remained of Uihlein's 2014 donation. At Stockman's direction, Posey proceeded to use these remaining funds to pay bills related to Stockman's Senate campaigns, including both his Texas campaign and a prospective campaign in Alaska. Posey also testified that Stockman instructed him to flee to Egypt with some of the remaining funds, using them to pay for flights and other travel expenses.[2]

## II.

In March 2017, Stockman was indicted on four counts of mail fraud, four counts of wire fraud, two counts of making false statements in FEC filings, eleven counts of money laundering, one count of conspiracy to make conduit

---

[2] By this time, Stockman had wind that he was the target of an FBI investigation. He thought that, by sending Posey to Cairo with the 2014 Uihlein funds, he could evade a potential asset freeze or forfeiture.

No. 18-20780

campaign contributions and false statements, one count of causing an excessive campaign contribution, and one count of filing a false tax return.

The district court denied Stockman's motions to dismiss the indictment and to strike surplusage. The case proceeded to a three-week jury trial, after which Stockman was convicted on all counts but one.[3] The district court denied Stockman's motions for judgment of acquittal, and later sentenced Stockman to ten years in prison and three years of supervised release. Stockman was also ordered to pay restitution in the amount of $1,014,718.51. He timely has appealed.

## III.

Stockman now argues that the district court erred by issuing problematic jury instructions, by denying Stockman's motions for judgment of acquittal under Federal Rule of Criminal Procedure 29, and by denying his motion to dismiss the indictment. With respect to the jury instructions, Stockman contends that the district court erred by defining 501(c)(3) and 501(c)(4) organizations in the charge and by failing to instruct the jury on Stockman's "good faith" defense to the tax and campaign finance counts. With respect to the denial of his Rule 29 motions, Stockman argues that the government failed to prove the existence of a fraudulent "scheme" devised with the requisite intent to defraud. Stockman also makes three arguments challenging his conviction for causing an excessive campaign contribution under Count 12 of the indictment, all of which essentially assert that the district court erred by failing to recognize that "express advocacy" is a necessary element of the

---

[3] Stockman was acquitted on Count 6, a wire fraud charge related to the Rothschild donations.

7

No. 18-20780

offense.  In total, Stockman's brief presents six alleged errors infecting one or more of his convictions.[4]  We find that each claim lacks merit.

A.

Stockman argues that his convictions for mail and wire fraud cannot stand because the district court issued "improper and unnecessary" instructions that confused the jury.   Specifically, Stockman draws our attention to a section of the jury charge that defines 501(c)(3) and 501(c)(4) organizations in the following manner:

> A 501(c)(3) organization is a nonprofit corporation, fund, or foundation organized and operated exclusively for religious, charitable, scientific, or educational purposes.

> Section 501(c)(3) organizations are generally exempt from federal taxation, and donations to [] these entities may be tax deductible.  If an organization is classified as a 501(c)(3) organization, none of its net earnings may benefit any private shareholder or individual.  A Section 501(c)(3) organization may not participate or intervene in any political campaign on behalf of or [in] opposition to any candidate for public office.

> A Section 501(c)(4) organization is a nonprofit organization operated exclusively for the promotion of social welfare. . . .  Section 501(c)(4) organizations are also generally exempt from federal taxation.  A Section 501(c)(4) organization may compensate employees for work actually performed, but the net earnings of a Section 501(c)(4) organization must be devoted exclusively to charitable, educational, or recreational purposes. The net earnings of a Section 501(c)(4) organization may not benefit any private shareholder or individual.

---

[4] Arguably, Stockman has also preserved a complaint about the district court's disjunctive Count 12 jury instructions.  Stockman appears to argue that the district court erred by allowing the jury to convict Stockman for inducing Uihlein's 2014 expenditure on advertisements "advocating Mr. Stockman's election *or* attacking Mr. Stockman's opponent" because the indictment alleged a conjunction.  But the government does not heighten its burden of proof by pleading criminal acts conjunctively.  *See United States v. Holley*, 831 F.3d 322, 328 n.14 (5th Cir. 2016).  Here, the government was not required to prove that Uihlein's money was spent on advertising "advocating for Stockman's election *and* attacking Stockman's opponent."  We thus decline to find error in the district court's disjunctive language.

No. 18-20780

At oral argument, defense counsel represented that Stockman principally objects that this language of the instructions was "irrelevant" and "unnecessary." Stockman concedes, however, that no contemporaneous objection was made at trial; instead, he now argues that the district court should have excluded the 501(c)(3) and 501(c)(4) definitions from the charge *sua sponte*.

Given Stockman's failure to object at trial, our review is for plain error. *United States v. Saldana*, 427 F.3d 298, 303–04 (5th Cir. 2005). Stockman must demonstrate "(1) that an error occurred; (2) that the error was plain, which means clear or obvious; (3) [that] the plain error [would] affect [his] substantial rights; and (4) [that] not correcting the error would seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 304 (quotation omitted).

We are not convinced that the district court erred by defining 501(c)(3) and 501(c)(4) organizations in the charge, but, in any event, no such error was sufficiently "clear or obvious" to survive plain error review. Many of the witnesses discussed 501(c)(3) and 501(c)(4) organizations in their testimony, and some of that testimony even went directly to the elements of mail and wire fraud. Stockman has not cited a truly analogous case, and we are not aware of one. We have said that an "error cannot be plain where there is no controlling authority on point and where the most closely analogous precedent leads to conflicting results." *United States v. Gomez*, 706 F. App'x 172, 177 (5th Cir. 2017) (quoting *United States v. De La Fuente*, 353 F.3d 766, 769 (9th Cir. 2003)). Similarly, when any analogy to existing authority would be strained, the district court's actions cannot amount to plain error.

Apart from his objection that the 501(c)(3) and 501(c)(4) definitions were "unnecessary," Stockman also argues that the definitions, though undisputedly drawn from the text of the Internal Revenue Code, misled the

jury by framing the obligations of 501(c)(3) and 501(c)(4) organizations in absolute terms. *See*, *e.g.*, *St. David's Health Care Sys. v. United States*, 349 F.3d 232, 235 (5th Cir. 2003) (suggesting that tax-exempt organizations must be operated primarily, rather than exclusively, for an exempt purpose). But, again, we cannot agree that the district court's statutory instructions merit reversal under the plain error standard. An instruction that mirrors relevant statutory text "will almost always convey the statute's requirements," *United States v. Lebowitz*, 676 F.3d 1000, 1014 (11th Cir. 2012), and Stockman has not identified any authority rendering it "clear or obvious" that a district court's jury instructions must go beyond the language of the statute in this context.

B.

Stockman next seeks to reverse his conviction for causing an excessive campaign contribution in the form of a coordinated expenditure, an offense covered by Count 12 of the indictment. Count 12 alleges that Stockman, acting through various agents, induced Uihlein to spend over $450,000 on *The Conservative News*, a political communication promoting the Stockman campaign. The government argues that, because Stockman was involved in requesting and spending the money for this project, Uihlein's $450,000 payment was a "coordinated expenditure" under the Federal Election Campaign Act, 52 U.S.C. § 30101 *et seq.* (FECA).[5]

---

[5] FECA treats "coordinated" expenditures like "campaign contributions," placing an upper limit on the amount of money that donors may spend on them. The government's position is that Stockman, having willfully caused Uihlein to spend more than $25,000 on a coordinated communication, is subject to the especially severe criminal penalties applicable to those who make campaign contributions in excess of $25,000. *See* 52 U.S.C. §§ 30116(a)(1)(A) (establishing upper limit on campaign contributions), 30109(d)(1)(A)(i) (authorizing extra punishment for campaign contributions in excess of $25,000), 30116(a)(7)(B)(i) (equating coordinated expenditures with campaign contributions); 18 U.S.C. § 2(b) (authorizing punishment "as a principal" for those who "willfully cause[] an act to be done which if directly performed by [them] or [others] would be an offense").

Stockman does not deny that, if the Uihlein donation were an "expenditure," it would be a "coordinated" expenditure of over $450,000, the equivalent of a campaign contribution well beyond statutory limits.  Indeed, he could not argue otherwise: the evidence shows that Stockman at the very least "cooperat[ed]" with Uihlein and Wagner's distribution of *The Conservative News.  See* 52 U.S.C. § 30116(a)(7)(B)(i) (coordinated expenditures are those made in "cooperation, consultation, or concert with" a candidate or his campaign committee).  For example, Wagner testified that mailing *The Conservative News* was Stockman's idea, that Stockman supervised him once distribution was underway, and that Stockman dictated some of the letter that secured funding from Uihlein.

Instead, Stockman's appellate challenges to the conviction turn on the word "expenditure."  Stockman argues that, in *Buckley v. Valeo*, 424 U.S. 1 (1976), the "Supreme Court cabined FECA's definition of 'expenditure' to encompass only 'funds used for communications that expressly advocate for the election or defeat of a clearly identified candidate.'"  Such "express advocacy" entails the use of "words [like] 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' [and] 'reject.'"  *Buckley*, 424 U.S. at 44 & n.52.  Stockman maintains that to effect a regulated "expenditure," donors must spend their money on communications containing these "magic words."  It is clear and uncontested that *The Conservative News* does not contain direct instructions to "vote for" or "defeat" any candidate.  It would follow, Stockman argues, that Uihlein did not effect an "expenditure" when he funded *The Conservative News*.

But the Supreme Court rejected this reading of FECA in *McConnell v. FEC,* 540 U.S. 93 (2003), *overruled on other grounds by Citizens United v. FEC*, 558 U.S. 310 (2010)).  In *McConnell*, the Supreme Court considered precisely the statutory language at issue here, namely the rule (now codified at 52 U.S.C.

§ 30116(a)(7)(B)(i)) that "expenditures . . . in cooperation, consultation, or concert with" a candidate are to be considered the equivalent of campaign contributions and restricted accordingly. *See McConnell*, 540 U.S. at 202. The *McConnell* Court explained that a post-*Buckley* statutory enactment had "clarifie[d] the scope" of this language, "pre-empt[ing]" a possible claim that "coordinated expenditures for communications that avoid express advocacy cannot be counted as contributions." 540 U.S. at 202. In other words, the Court held that the presence of express advocacy is not a prerequisite of the "settled" rule that when expenditures are "controlled by or coordinated with the candidate and his campaign[,] [they] may be treated as indirect contributions subject to FECA's . . . amount limitations." *Id.* at 219 (cleaned up).

Stockman seeks to distinguish *McConnell* on the ground that "*McConnell* held . . . the express advocacy requirement for expenditures . . . preempted only with respect to . . . narrowly defined 'electioneering communication[s].'"[6] Not so. The relevant portion of *McConnell* deals separately with two distinct subsections of FECA, one pertaining to electioneering communications and the other to expenditures "more generally." 540 U.S. at 202. The latter subsection, not the former, was the focus of the Court's "preemption" comment. *Id.* We reject Stockman's construction of the statute.[7]

---

[6] An "electioneering communication" is "any broadcast, cable, or satellite communication that refers to a clearly identified candidate for federal office and is made within 30 days of a primary or 60 days of a general election." *Citizens United*, 558 U.S. at 321 (cleaned up). The *McConnell* decision is largely, but not exclusively, concerned with Congress's regulation of these communications. *See* 540 U.S. at 189–02.

[7] Stockman also attempts to escape *McConnell* by invoking *Center for Individual Freedom v. Carmouche*, 449 F.3d 655 (5th Cir. 2006), and *Chamber of Commerce of the United States v. Moore*, 288 F.3d 187 (5th Cir. 2002). But neither case analyzed whether *Buckley*'s limiting construction should apply to coordinated expenditures. *Carmouche* interpreted a Louisiana statue that "link[ed] disclosure requirements for expenditures made by *independent* individuals" to language that the Supreme Court narrowed in *Buckley*. *Carmouche*, 449 F.3d at 664 (emphasis added). *Moore* found that the relevance of express advocacy was clear because the Mississippi statute under scrutiny had "essentially adopted

No. 18-20780

C.

We next consider Stockman's argument that his tax and campaign finance convictions under Counts 10, 11, 12, and 28 of the indictment were tainted by the district court's refusal to instruct on "good faith." Stockman points to evidence that he relied on an accountant who "wrongly advised him that having aides contribute money to his congressional campaign in the name of their parents was permissible." He also points to evidence that Stockman and Posey intentionally omitted words of express advocacy from *The Conservative News* in order to comply with FECA. He asserts that "[i]n this context and where willfulness is required, a good faith instruction should have been given."

Again, we disagree. Although the parties dispute the standard of review applicable to the district court's refusal to instruct on good faith, decisions of this court and the Supreme Court show that the refusal was not erroneous, whether reviewed *de novo* or for plain error. *See United States v. Pomponio*, 429 U.S. 10, 11–12 (1976); *United States v. Simkanin*, 420 F.3d 397, 409–11 (5th Cir. 2005). Stockman argues that a good faith instruction should have been issued because the tax and campaign finance offenses in question all require a showing of "willfulness."

But it is precisely that requirement that renders any such instruction unnecessary. The Supreme Court held in *Pomponio* that an additional good faith instruction is not required when the charge already requires proof of "willfulness," properly cabined to cover only "voluntary, intentional violation[s] of . . . known legal dut[ies]." 429 U.S. at 12 (quotation omitted). In so holding, the Court gave its approval to a charge that did not instruct on good faith but

---

the language" of the *Buckley* limiting construction. *Moore*, 288 F.3d at 196. These cases are distinguishable and neither one casts doubt on the conclusions we draw from *McConnell*.

No. 18-20780

did instruct on the need for proof of a "willful" act, meaning an act "done voluntarily and intentionally and with the specific intent to do something which the law forbids, that is to say with [the] bad purpose either to disobey or disregard the law." *Id.* at 11–12 (quotation omitted). Drawing from *Pomponio*, we held in *Simkanin* that a "specific instruction" on good faith is not required when the concept is sufficiently subsumed by a general instruction on "willfulness." 420 F.3d at 409–11. *Simkanin*, like *Pomponio*, approved of instructions alerting the jury to the fact that a "willful" act is done "voluntarily and deliberately," with the intention of "violat[ing] a known legal duty." *Id.* at 409–10.

Here, the district court's instructions mirrored those in *Pomponio* and *Simkanin*. With respect to Counts 10, 11, and 12, the district court instructed the jury that to act "willfully," the defendant must act "voluntarily and purposely, with the specific intent to do something the law forbids, that is, with the bad purpose either to disobey or disregard the law." With respect to Count 28, the district court instructed the jury that it could not convict unless it found that Stockman acted "with intent to violate a known legal duty." We find no merit in Stockman's "good faith" argument.

### D.

Finally, we address Stockman's challenge to the evidence supporting his convictions for mail fraud, wire fraud, and money laundering.[8] Stockman argues that the district court erred when it denied his motions for judgment of acquittal under Rule 29, contending that the government failed to prove a fraudulent "scheme" that Stockman devised with the necessary intent to

---

[8] As to the money laundering convictions, Stockman argues only that the government cannot meet its burden to prove a predicate offense if the fraud convictions lack evidentiary support. *See* 18 U.S.C. §§ 1956–57. Because we reject Stockman's challenge to the fraud convictions, we necessarily reject his challenge to the money laundering convictions as well.

defraud. *See* 18 U.S.C. §§ 1341, 1343. We review the denial of a Rule 29 motion *de novo*, asking whether "any rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt." *United States v. Xu*, 599 F.3d 452, 453 (5th Cir. 2010) (quotations omitted).

The elements of mail fraud are "(1) a scheme to defraud; (2) use of the mails to execute the scheme; and (3) the specific intent to defraud." *United States v. Simpson*, 741 F.3d 539, 547–48 (5th Cir. 2014) (quotation omitted). The elements of wire fraud are "(1) a scheme to defraud; (2) the use of, or causing the use of, wire communications in furtherance of the scheme; and (3) a specific intent to defraud." *United States v. Harris*, 821 F.3d 589, 598 (5th Cir. 2016). In evaluating its sufficiency, we view the evidence in the light most favorable to the government. *United States v. Rodgers*, 624 F.2d 1303, 1306 (5th Cir. 1980). Stockman challenges the evidence supporting his convictions with respect to both the "scheme" and "intent" elements of mail and wire fraud.

1.

Challenging the denial of his Rule 29 motions, Stockman argues that the government's evidence does not establish a fraudulent "scheme." His reasoning is somewhat tortuous. Stockman argues that, although purporting to allege a single scheme, the indictment actually alleges "no fewer than four separate 'schemes.'" He further asserts that at least one of these four separate schemes, the 2014 Uihlein "scheme," is not supported by sufficient evidence because the government failed to prove that in the 2014 scheme Uihlein was deprived of money or property. Then, expressly reverting to a single-scheme argument, he contends that, because the jury returned a general verdict without specifying which "scheme within a scheme" it was relying on to satisfy the "scheme" element of mail and wire fraud, all seven mail and wire fraud convictions must be set aside for failure to prove a scheme. *See Yates v. United States*, 354 U.S. 298, 311 (1957) ("[A] verdict [must] be set aside in cases where

the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected."), *overruled on other grounds by Burks v. United States*, 437 U.S. 1 (1978).

Stockman's arguments are confected on a foundation of sand. The evidence shows that there was only one scheme, a scheme to separate wealthy donors from their money and to spend that money at Stockman's pleasure and direction. Furthermore, there is no merit in Stockman's argument that the 2014 Uihlein solicitations did not threaten to deprive Uihlein of money or property. Each donation from each donor, Uihlein included, was given under the false pretense that the donor's money would be used for specific purposes, including "voter education" and independent political advocacy. The money was not used for those purposes. Instead, it was, at all times, under Stockman's control. He used it to finance his political career and sustain his self-indulgent lifestyle. It is thus clear that all of Stockman's solicitations were designed to effectuate a traditional "money or property" fraud.

In short, we hold that there was no failure of proof regarding the "scheme" element of mail and wire fraud. On the contrary, viewing the evidence in the light most favorable to the conviction, we find ample support for the government's position that Stockman orchestrated a single scheme to appeal to the charity of politically-interested donors for fraudulent purposes.

2.

Stockman further challenges the denial of his Rule 29 motions on the ground that the government produced insufficient evidence of Stockman's fraudulent intent. In this context, he argues that the government's evidence does not suggest a "contemporaneous" intent to defraud because evidence of Stockman's illicit spending cannot establish bad faith simultaneous with the solicitation and receipt of donor funds. From this premise, Stockman concludes that the government's case is based on nothing more than "evidentiary time

travel." Stockman's time-and-space argument is weakened by the absence of evidence supporting it, but even more by the very strong evidence from which the jury could reasonably infer that Stockman had the intent to defraud from the time the money was donated until it was fully spent.

Stockman does not deny that, shortly *after* receiving donations from Rothschild and Uihlein, he misappropriated the funds by disregarding the purposes for which they were donated. Indeed, Stockman does little to dispute the overwhelming evidence that, shortly after receiving it, he quickly diverted donor money to personal and political projects having nothing to do with philanthropy or education. Notwithstanding Stockman's self-serving view that later misappropriations cannot evidence earlier bad faith, the jury could rationally have inferred Stockman's fraudulent intent from this largely undisputed evidence. We thus find that the government has also met its burden with respect to the "intent" element of mail and wire fraud.

## IV.

In this appeal, we have held that the district court's instructions were not erroneous. It was not plain error for the district court to define 501(c)(3) and 501(c)(4) organizations in the charge, and Stockman was not entitled to an instruction on good faith. We have also held that the district court did not err by denying Stockman's motions for judgment of acquittal under Rule 29. The government provided ample evidence that Stockman fraudulently devised, and implemented, a scheme to deprive two donors of their money and property, thus allowing the jury to rationally find Stockman guilty of mail fraud, wire fraud, and money laundering. And, we have further held that FECA's contribution limits apply to coordinated spending on political communications,

irrespective of whether those communications contain magic words of express advocacy. We thus have affirmed Stockman's campaign finance conviction.

In sum, the judgment of the district court is, in all respects,

AFFIRMED.